OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Gary Blackburn, filed March 27, 2008. On September 6, 2007, Blackburn was indicted on seven counts of rape of a child less than ten, in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree. Following a jury trial in late February, 2008, Blackburn was convicted of six counts of rape. The victims were Blackburn's *Page 2 
sons, J.F., born December 15, 1996, and twins B.F. and Z.F., born May 21, 1999. Blackburn received consecutive life sentences for each offense, and he was classified as a Tier III sex offender.
 {¶ 2} Blackburn asserts one assignment of error as follows:
 {¶ 3} "WHETHER DEFENDANT'S CONVICTIONS AND SENTENCE WERE SUPPORTED BY SUFFICIENT QUALITATIVE AND QUANTITATIVE EVIDENCE, ERRONEOUS AS A MATTER OF LAW, AND THEREBY VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO STATE CONSTITUTION."
 {¶ 4} Blackburn argues that his conviction and sentences were against the manifest weight of the evidence and not supported by sufficient evidence.
 {¶ 5} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997,2006-Ohio-3367, ¶ 32.
 {¶ 6} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. State v.DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious *Page 3 
exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." State v.Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 7} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 8} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; see, also, State v.Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541." State v.McKnight, 107 Ohio St.3d 101, 112, 837 N.E.2d 315, 2005-Ohio-6046, ¶ 70.
 {¶ 9} The following eight witnesses testified at trial for the State: Theresa M. (Theresa, hereafter), the maternal great-aunt of the victims; Z.F.; Lori Vavul-Roediger, the Medical Director for the Department of Child Advocacy and an expert in child abuse pediatrics; Pam Bailey, a licensed independent social worker employed at South Community Behavioral Healthcare who treated the boys; B.F.; Brenda Miceli, a psychologist employed at Children's Medical Center; J.F.; and Shelly K. (Shelly, hereafter), the victims' aunt. For the defense, the following six witnesses testified: Bradley Blackburn and Gary Ryan Blackburn ("Ryan"), sons of Gary Blackburn; John Blackburn, oldest *Page 4 
brother of Gary Blackburn; Kimberly Blackburn, wife of John Blackburn; Brian Amore, longtime friend of Gary Blackburn; and Gary Blackburn. The witnesses' testimony is summarized below.
 {¶ 10} Theresa has full custody of the complainants, and she testified that at the time of trial, the three boys had been living with her and her husband, Jude, for almost three years. Theresa was 59 years old at the time of trial, and she had already raised her own two children into adulthood. According to Theresa, the victims' mother, Kelley F., left Gary and the boys in 2000 and is not involved in the boys' lives. Prior to living with Theresa, the boys lived with Gary, and for a time Gary's girlfriend, Kim Trace, also lived with them. According to Theresa, Kim eventually moved out, and the condition of Gary's house soon deteriorated.
 {¶ 11} Theresa began to see the boys more frequently in the summer of 2005, taking them to her home to swim in her pool and to her sister's home, where there is also a pool. In the middle of July, 2005, Theresa agreed with Gary, at his request, to take the children for approximately two weeks, because "there was no electric or water or food in the house." Also, Gary wanted to make repairs and sell the house. At the time, the twins had just turned six, and J.F. had just turned eight.
 {¶ 12} A couple of weeks after the children moved into Theresa's house, she became suspicious that the children had been abused, and she contacted the police. When asked, the children told Theresa that Gary was penetrating them orally and anally. Theresa testified that it was sometimes difficult to understand the twins when they spoke to her due to speech problems. On or about September 1, 2005, Theresa took the children to Children's Medical Center to be examined, and the examination revealed no evidence of abuse. The children also met with detectives at CARE House (Child Abuse Review and Evaluation). Theresa was not present for the interview there, and *Page 5 
she testified that the children were scared to go. Theresa did not have personal knowledge about what the boys told the detectives.
 {¶ 13} Theresa also took the children for counseling at South Community with Pam Bailey, because all of them were experiencing nightmares and nightly bed wetting. All of them were also afraid of the dark. The children received counseling at South Community for over a year, and they later received counseling from Kathy Cooper at the Ohio Advocate Program. According to Theresa, the reason for the change in counseling was because the boys "started touching each other" in a sexual manner.
 {¶ 14} Theresa again contacted the police in 2007, reporting similar allegations of abuse. She testified that the boys "were talking more, telling more [sexual] stuff," that had happened to them at Gary's house than they had initially. According to Theresa, the children "felt more secure, wasn't scared and [were] ready to talk." Theresa testified that the children did not want to return to Gary's house.
 {¶ 15} Theresa testified that before the boys joined their household in 2005, she and her husband traveled quite a bit, going to Paris, Germany, Hawaii and on cruises, seeing the boys infrequently. Theresa stated that her lifestyle has changed since the boys joined her household and she no longer travels. Theresa receives four hundred and ten dollars a month from the State of Ohio to care for the boys, and she claims them as dependents on her taxes. She received an earned income credit for them as well. Theresa also testified she received, for three years only, five hundred dollars a child every six months from Children's Services, although this benefit was near its end at the time of trial. *Page 6 
 {¶ 16} Z.F., who was eight at the time of trial and in second grade, testified that his mother left when he was one year old, and he has not seen her since then. Z.F. testified that he and his brothers lived with Gary and a man named Keith, who was a friend of Gary's, before they moved in with Theresa. He stated that he and his brothers and Gary all slept in the same bedroom; B.F. and Z.F. shared a bed, and J.F. and Gary shared a couch. Z.F. testified that Gary repeatedly told him and his brothers to remove their pants and underwear in the bedroom "so the blood didn't get on the clothes," and then Gary "put his pee-pee up our mouths and butts." Z.F. stated that when Gary anally penetrated him it hurt a lot and made him bleed, and that he screamed and cried. Z.F. testified that Gary made J.F. clean Z.F. up with a paper towel when he was finished. Z.F. stated that Gary abused the boys this way on their last day in his home, before they moved in with Theresa. Z.F. stated that he observed Gary anally and orally penetrate B.F. and J.F. that same day.
 {¶ 17} Z.F. testified that his cousin, M.M., would come over to visit on the weekends close to the time the boys moved in with Theresa. M.M.'s mother is the sister of the victims' mother. Z.F. testified that he observed Gary anally and orally penetrate M.M., who was younger than Z.F. Z.F. testified that M.M. screamed when it happened, and that Gary told M.M. to "shut up." Z.F. testified that J.F. cleaned M.M. up after the rape. Z.F. testified that he did not tell Theresa what Gary was doing while they lived with him because "he threatened us," and Z.F. was scared. According to Z.F., Gary told the boys "he would cut our heads off." Z.F. told Theresa what Gary had done once the boys moved in with her because "I knew he wouldn't get us because we were at Theresa's."
 {¶ 18} On cross-examination, Z.F. testified that Gary used to play video games with the boys and take them to the park, and that they had a good time with him. Z.F. testified that Gary abused them about four times a week, every week, from 2000, when his mother left, until 2005, and that *Page 7 
blood ran down his leg each time, forming a puddle on the floor. Z.F. later testified that he did not remember anything prior to 2003. Z.F. testified that after Gary finished raping the boys, he "knocked us out," and that they would remain unconscious for an hour. Z.F. testified that when he woke up, he had headaches for half an hour. Z.F. testified that being knocked out left lumps on the boys' heads. According to Z.F., Gary also made them smoke marijuana.
 {¶ 19} On redirect, the following exchange occurred:
 {¶ 20} "Q. And `unconscious' is a pretty big word. Do you really know what that word means?
 {¶ 21} "A. Yes, that means knocked out.
 {¶ 22} "Q. * * * And would you be knocked down to the ground?
 {¶ 23} "A. Yes.
 {¶ 24} "Q. Could you hear what was happening to your brothers when you were down on the ground?
 {¶ 25} "A. No.
 {¶ 26} "Q. * * * Could you see anything?
 {¶ 27} "A. No.
 {¶ 28} "Q. * * * were you ever afraid of what would happen if you opened your eyes and got up?
 {¶ 29} "A. Yes.
 {¶ 30} "Q. What were you afraid of?
 {¶ 31} "A. That Gary would still about to knock us out. (sic)
 {¶ 32} "Q. * * * You were afraid if you got up, he'd knock you back down. *Page 8 
 {¶ 33} "A. Yeah.
 {¶ 34} "Q. So did you just stay down on the ground?
 {¶ 35} "A. Yes."
 {¶ 36} On recross-examination, Z.F. testified that sometimes when he "came to," his brothers were still unconscious, and that the longest he ever observed one of his brothers unconscious was an "hour and 15 minutes," and that the longest Z.F. had been unconscious was an "hour and a minute."
 {¶ 37} Z.F. testified that Theresa told the boys to tell the truth.
 {¶ 38} •
 {¶ 39} Doctor Lori Vavul-Roediger testified that she did not examine the victims herein, but that she reviewed the records of their examinations, along with the records of M.M. Lori indicated in the course of her career, she has seen approximately 4,000 children for allegations of sexual abuse. According to Lori, there were no abnormal findings with respect to any of the brother's medical examinations. Lori testified, "it's important for the jury to understand that a normal genital and anal exam does not confirm and it likewise does not rule out the possibility of sexual abuse or penetration with regard to pre-adolescent boys * * *
 {¶ 40} "We need to realize that the anal structure itself is elastic and distensible * * * penetration may occur which results in no permanent abnormality of the anal structure." Lori also noted that four weeks or so elapsed from the last time the children were allegedly abused by Gary and their examinations. According to Lori, "If there was anal penetration — which I cannot confirm — and if there were injuries — which again I cannot confirm — I can tell you that medically speaking and to a reasonable degree of medical certainty, injuries could have healed and no longer have been visible. I cannot tell you there was definitely anal penetration; I cannot tell you definitely there were *Page 9 
anal injuries. I can tell you from medical literature — and I can tell you from my own personal clinical experience — anal injuries heal rapidly and can heal with complete resolution so that they are no longer visible on examination.
 {¶ 41} "* * *
 {¶ 42} "It is not without possibility that children have sustained prior anal trauma with bleeding and subsequently have resolution of such that within a given lapse of time, on a follow-up exam, there is no finding of abnormality."
 {¶ 43} On cross-examination, Lori reiterated that she has seen children in the emergency department with "significant anal lacerations who have re-presented for follow-up * * *
 {¶ 44} sometimes within five days, who have no obvious sign of significant abnormalities on their anal exams."
 {¶ 45} Defense counsel asked if, when a child's "behind is being penetrated in such a violent fashion that he bled down his leg and left a puddle four times a week five years in a row," the body would "compensate for that repeated irritation?"
 {¶ 46} Lori responded, "children who are repeatedly anally penetrated, what they actually do to compensate for such, is they voluntarily dilate their anal sphincter to tolerate the penetration.
 {¶ 47} "* * *
 {¶ 48} "I have no proof that any of these children actually had their anal sphincters torn. If they did, they probably would've had to present to an emergency department for surgical repair so I doubt that these children actually had clear definitive trauma through their anal sphincters. But likely, if, what they report happened and if they had bleeding, they probably had damage to the mucosal or sort of the skin lining of their anal canals. That's different." *Page 10 
 {¶ 49} Lori explained the process of an anal exam for the jury. She described in general terms a "head-to-toe" exam for "any other health concerns," including the child's eyes, ears, heart, lungs, back, abdomen, arms, legs and genital area. Then, the child's anal area is examined with a "culpascope," "which is a bright light and has a magnification source on it which is projected to a computer screen. And that permits the anal structure to be visualized larger than, obviously, being seen with the naked eye. And in this regard, the outside surface of the anal area — * * * can then be well-visualized or seen by the examining doctor or other medical provider conducting the examination.
 {¶ 50} "So again, in my practice when kids are seen for nonacute sexual abuse, the culpascope or anascope is used to look at the outside or external portion of the anus. There is nothing that's done on an internal examination, * * * nothing is inserted inside the anus. * * * their rectal canal is not looked at, for instance.
 {¶ 51} "If there's ever a concern that a child presents with severe anal trauma or, * * * rectal tearing obviously that child has to typically go to the emergency department and then is evaluated by a surgeon if there's that level of trauma that * * * there might need to be a surgical repair."
 • {¶ 52} Pam Bailey testified that she treated J.F., B.F. and Z.F., beginning in late 2005. Pam testified that J.F. was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), Depressive Disorder Not Otherwise Specified ("DDNOS"), and Enuresis Nocturnal (bedwetting nightly). PTSD means "the client has had to have experienced a traumatic event; has to be reliving or experiencing that traumatic event, * * * persistently in their life, and then also avoiding stimuli that may be associated with that traumatic event." DDNOS "means that they meet some criteria for a depressive type *Page 11 
disorder but not for a specific depression disorder or mood disorder such as bipolar or major depression." When J.F. was discharged in November, 2006, according to Pam, he had achieved his goal of lessening his nightmares and he had decreased his worry and anxiety. J.F. was referred to Ohio Youth Advocacy, however, due to "sexually reactive behaviors," which means J.F. "had perpetrated against another person, sexually." Pam stated that sexually reactive behavior "can be" consistent with sexual abuse.
 {¶ 53} Pam testified that B.F. was also diagnosed with PTSD, DDNOS, and Enuresis Nocturnal. Pam noted progress with B.F., but she later also referred B.F. to Ohio Youth Advocacy for sexually reactive behaviors.
 {¶ 54} Z.F. was diagnosed with Enuresis Nocturnal and Anxiety Disorder Not Otherwise Specified, which means "he had symptoms of anxiety but didn't meet specific criteria for maybe say separation anxiety or post-traumatic stress disorder." Pam treated Z.F. from December, 2005 until January, 2007, when his therapy was completed.
 {¶ 55} Pam testified that "it is not my job to determine whether or not [the children] have been sexually abused." On cross-examination, she acknowledged that she has patients who do not complain of sexual abuse but who present with symptoms the same as the boys.
 • {¶ 56} B.F., who was eight at the time of trial and in second grade, like his twin brother, testified that Gary placed his penis "inside [B.F.'s] butt," and that it hurt a lot at the time and also afterwards. When asked if he experienced bleeding, B.F. replied, "[s]ometimes a lot, sometimes not." B.F. also testified that Gary placed his penis inside B.F.'s mouth. According to B.F., Gary abused him while J.F., Z.F. and sometimes M.M. were in the bedroom. B.F. also testified that he *Page 12 
observed Gary place his penis into both his brothers' and M.M.'s mouths and "butts." B.F. was asked what he did when Gary abused him, and he responded, "You just do nothing." B.F. was also asked what he thought Gary would do to him if the boys revealed the abuse, and he responded, "Cut our heads off." According to B.F., Gary would clean up the blood when the abuse was finished with a towel, and he would put the towel in the washer. Sometimes Gary made J.F. clean him up. B.F. stated that Gary would hit him in the forehead and knock him unconscious for "five hours or so" after the rapes. B.F. stated that Gary knocked the boys out "[b]ecause he thinked that we wouldn't remember a thing." He said the punches left bruises on his forehead that would last for 10 days or so. According to B.F., Gary covered the bruises with makeup that his former girlfriend, Kim, left behind.
 {¶ 57} On redirect, B.F. testified that when Gary hit him, he was scared to get back up "because I think he'll do it again." B.F. testified that he would lay there and go to sleep. B.F. also stated that Gary made him smoke marijuana.
 • {¶ 58} Brenda Miceli next testified for the State. According to Brenda, she has been employed at Children's Medical Center for the last nine years, primarily working with children who disclose sexual abuse. For purposes of her testimony, the trial court declared her an expert in clinical psychology with specialized knowledge in the area of sexual abuse.
 {¶ 59} Brenda testified that she did not treat the victims herein, but she testified regarding her knowledge of common characteristics of children who have been sexually abused. According to Brenda, there "is no one set of characteristics that would be diagnostic of child sexual abuse. There's *Page 13 
no one set of behaviors that children present with.
 {¶ 60} "* * *
 {¶ 61} "* * * Children can have a number of different behavioral difficulties. We divide
 {¶ 62} them, generally, into three different groups. They're what we call `internalizing behaviors' where children have nightmares, are regressive, anxiety, depression, things along those lines.
 {¶ 63} "The externalizing behaviors are behaviors where children are acting out. They're having outbursts, can be aggressive with other people, oppositional and defiant. Sometimes that can go to the extent of substance abuse or other delinquent behaviors.
 {¶ 64} "The third category that we often include would be sexualized behaviors which are behaviors outside the range of what's considered normal sexual behavior for children.
 {¶ 65} "None of these categories of behaviors, again, are necessarily indicative of child sexual abuse. Many children who experience abuse don't have any negative symptoms that come following the abuse. And these types of behaviors can come from other types of traumatic events of stressful situations that kids go through."
 {¶ 66} Brenda stated that the average length of time between an event of abuse and disclosure of that abuse "is about three years."
 {¶ 67} '* * *
 {¶ 68} "There are a number of reasons that children don't disclose. Oftentimes they're afraid. Children believe that they will oftentimes be in trouble, banished, and that something inappropriate has occurred and they kind of learned over time that when something inappropriate occurs, that they often get in trouble for that. So they can be afraid that they will get in trouble. *Page 14 
 {¶ 69} "Sometimes they can be afraid that * * * the person who is abusing them will get into trouble. Children oftentimes have very mixed feelings towards the person who is abusing them and while they may not like what is occurring, they love that person and that's the person they count on for security and stability in their lives.
 {¶ 70} "* * *
 {¶ 71} "* * *Usually by about seven or eight, children know that that's inappropriate and those behaviors should not be occurring.
 {¶ 72} "Younger children, especially preschool children, don't necessarily understand that those behaviors are inappropriate."
 {¶ 73} When asked about the process of disclosure, Brenda testified that a wide range of disclosure processes exist. She stated that some kids will not disclose abuse until they feel safe. Even if a child discloses abuse to a person of trust, they may be unable to discuss the abuse with authorities who later become involved. Sometimes, according to Brenda, children will disclose a little bit of information, and once the child realizes that the information will be handled appropriately, they will disclose more information over time.
 {¶ 74} Brenda stated, if the abuser is a parent or authority figure, children may feel helpless in such a situation, and "the research says that kids are more likely to disclose abuse when it's by a stranger or someone that they're not close to."
 {¶ 75} When asked about children sexually "acting out," Brenda responded, "All children are sexual and engage in types of sexual behaviors. * * * And behaviors that involve force or coercion, behaviors that involve penetration, behaviors that are involving more adult types of acts generally are outside the range of normal sexual behavior." *Page 15 
 {¶ 76} Brenda testified that it is difficult for children before the age of three or four to recount the abuse that happened to them. She stated that children aged three, four, five and six "oftentimes have difficulty with frequency, with time frames, where you have a great deal of difficulty putting things into a sense of time.
 {¶ 77} "One of the other things that can come up is that if abuse has happened on a regular basis, it can be difficult to recall specifics of each incident. Similar to if I asked you to tell me about your Christmas five years ago and tell me what you [were] wearing and what you got and what you ate, you could probably give me a general idea but you might not be able to recall specifics. Does that mean that Christmas didn't happen? * * * It just means that you don't recall the specifics of that particular incident at that particular time."
 {¶ 78} When asked if abused children "ever add things that maybe the abuser did to them to up the violence that was involved in the situation," Brenda responded:
 {¶ 79} "That can happen occasionally. The dynamic that's usually present for that is that children feel helpless and feel like they should have done something. Most kids that I talk to have some sense of guilt that they should've done something to stop the abuse. And that can be their way of making it so that it was okay not to fight back or it was okay that this happened to them. It's not their fault if this person was aggressive or violent towards them."
 {¶ 80} On cross-examination, Brenda testified that children sometimes elaborate when disclosing abuse, but "in order to give information that we wouldn't expect a child that age to have, there usually has to be some basis for it." Brenda stated that the departure of the boys' mother also could play a prominent or decisive role in their behavior, but she stated
 {¶ 81} that many children are left by a parent, but most of those children "do not come up *Page 16 
with allegations of sexual abuse." Brenda reiterated that children aged four to seven "have a difficult time with the concept of time and being able to define what is a week."
 • {¶ 82} J.F., who was eleven at the time of trial, testified, consistent with his brothers, that he and Gary slept on a couch while the twins shared a bed in the downstairs bedroom. For fun, J.F. said the boys would play "killing games" on the Xbox together, along with Gary's older sons when they would stop by. J.F. stated that Gary would play the games with them, too.
 {¶ 83} On the boys' last day in Gary's house, before they moved in with Theresa, J.F. testified that he and his brothers were in the living room together, when Gary told all the boys to take off their pants. According to J.F., Gary took his own pants off, and he "put his pee-pee in our butts." J.F. stated Gary raped Z.F. first, then B.F., then J.F. J.F. testified that it did not hurt when Gary penetrated him, but that it hurt B.F. and Z.F. J.F. testified that his brothers "tried to scream," but Gary had his hand over their mouths. J.F. testified that he observed "white stuff come out of Gary's penis, "[a]fter he got done," and that Gary "put it in the jar." J.F. testified that Gary did the same thing to each of the boys in the bedroom. J.F. also testified that Gary placed his penis in each of the boys' mouths, and that he did so "every day."
 {¶ 84} When asked about M.M., J.F. testified that their cousin would come to visit on the weekends close to the time they moved in with Theresa, and he would spend Friday and Saturday night and share the bed with the twins. According to J.F., on the four boys' last weekend together, Gary penetrated all of them anally. J.F. observed Gary anally rape M.M., and then Gary put his penis in M.M.'s mouth. According to J.F., M.M. "puked up his food." When Gary placed his penis in B.F.'s mouth, B.F. "started to try to puke up but he didn't." J.F. testified that when Gary put his *Page 17 
penis in J.F.'s mouth, he told him to get on his knees. J.F. said Gary's penis was "nasty" because "it had been in someone else's mouth." J.F. observed "white stuff come out of Gary's penis. J.F. stated that when he was finished, Gary "put his pants back on and went onto his computer," while the boys "went and played Xbox." J.F. stated that he had to clean up the boys when they were bloody, and that he had seen blood in his own underwear. J.F. stated that it sometimes hurt to use the bathroom after being penetrated. J.F. stated that Gary would hit him in the forehead after raping him, and that he would have bumps and bruises on his forehead. According to Justin, Gary would cover the bruises with makeup. Justin said the makeup would wash off when he went swimming, and that when Theresa asked him what happened, he said, "I hit my head on the table."
 {¶ 85} J.F. testified that he did not tell his aunts about the abuse because Gary would threaten the boys, saying he would cut their throats, before she arrived to pick them up.
 {¶ 86} According to J.F., he first told Theresa what had happened when "Theresa heard [B.F.] and [Z.F.] humping." J.F. testified, "[B.F.] wanted to bump [Z.F.] * * * ." When asked what "bump" means, J.F. stated, "[l]ike to put their pee-pee in someone's butt." Theresa asked the boys, "why was you guys saying that stuff," and the boys eventually told her what had been going on at Gary's house. J.F. said he stopped calling Gary "dad" when he moved in with Theresa, because Theresa said she would adopt the boys and give them her last name.
 • {¶ 87} Shelly was the final witness to testify for the State. Shelly testified that her son, M.M., was six at the time of the trial. According to Shelley, M.M.'s father is not a part of his life. Shelley testified that J.F. and the twins are her sister's children. Shelley testified, in the months leading up to Theresa taking the kids, she and Gary were working together at Burger King. *Page 18 
According to Shelley, she "got him the same shift I worked and I picked him up every morning and took him home." Shelley testified that Gary worked there for two months and quit.
 {¶ 88} Shelley stated that she used to drop M.M. off at Gary's house on Friday and pick him up on Sunday, when M.M. was four years old, on a weekly basis for two months, until Theresa took the boys. According to Shelley, it "was like because I gave him groceries. Instead of him paying me back, he watched [M.M.] on the weekends." Shelley testified that M.M. initially enjoyed going over to Gary's house, but then he "didn't want to get out of the car. He'd cry, `I Don't want to go. I don't want to go.'" According to Shelley, M.M. "was hysterical. He didn't want to go. Fighting me when I was trying to get him out of the car." Shelley testified that M.M.'s behavior did not "raise any red flags" with her; she "thought [M.M.] was just trying to be up my butt and didn't want me to leave him there and didn't want me to do anything so Gary came to the car to get him. And I would call Gary and to make sure [M.M.] was okay and Gary said yes."
 {¶ 89} Each weekend, Shelly packed a bag with two outfits for M.M., two pairs of underwear and socks, his blanket and Elmo. When Shelley picked M.M. up, she brought home his dirty clothes, "except for his underwear." Shelley asked Gary about M.M.'s underwear, and he "said they were with his kids' underwear and he would wash them and give them back the next week but I never got them back and I didn't ask for them."
 {¶ 90} Shelley said M.M. was dirty when she picked him up on Sundays. On one occasion, she testified that once home she prepared to give M.M. a bath, undressing him and putting him in the tub. According to Shelley, when M.M. was in the tub, he was crying, and "he says please don't wash my butt. I says I have to wash your butt. `Cause I assumed he didn't wipe very good for being over at Gary's so I told him I had to get the poopy off." Shelley testified, M.M. was "[g]rabbing his butt, *Page 19 
`no, no, no, no, don't get no water, no water, no, no. It's going to burn, it's going to burn.' But I washed him anyway * * *." Shelley did not examine M.M. She stopped taking M.M. to Gary's because Gary "asked Theresa to take the kids to get back on his feet."
 {¶ 91} Shelley learned of the abuse from Theresa after the boys had been with her for a week. When Shelley asked M.M. about what had been going on at Gary's, M.M. "went to the floor kicking and screaming and wouldn't say anything."
 {¶ 92} On cross-examination, Shelley testified that M.M. was put on multiple medications after the abuse was disclosed, including Adderall, along with another medication in the afternoon for anger, and medication for his blood pressure and his heart. She admitted that M.M. had experienced some emotional problems prior to staying at Gary's house.
 • {¶ 93} Bradley Blackburn, Gary's 21 year old son, was the first witness to testify for the defense. Bradley testified that he would visit his father and the boys "about every other weekend." According to Bradley, "[t]he attitude toward my father was, for the children * * * very good. They didn't fear him in any way. They never had fear of him. They loved him. I love him. No bumps or no bruises. I never witnessed any of that and they obviously didn't fear him of getting hit again because they went back to him for love and affection. So I really don't understand that at all." Bradley testified Gary's form of discipline with the boys was to talk to them, "telling them what they did wrong but no beating of any sort."
 {¶ 94} Bradley testified that he never observed any bloody towels in the house when he visited. Bradley testified that Gary's former girlfriend, Kim, is his mother, and that Kim moved out in 2005. On cross-examination, Bradley testified that he only visited Gary and the boys after *Page 20 
Kim moved out "probably three times," and that most of the time he visited Gary's house was when Kim was there. Bradley said Gary initially left Kim when Bradley was two or three, and he was raised by Kim. Bradley testified he was unaware that Gary's house lacked running water and enough food for the boys, or that Gary was borrowing electricity from the neighbor next door. Bradley admitted Gary has problems keeping a job. Bradley testified that he called Gary every time before he went to visit him. Bradley said he and the children had a good relationship, and he loves Gary very much.
 • {¶ 95} John Blackburn, Gary's oldest brother, next testified on his behalf. John has been a building maintenance mechanic for Montgomery County's Public Works Department for 22 years. According to John, he saw Gary, during the period between 2002 and 2005 approximately once or twice a week. When John arrived at Gary's home, the boys "were sitting, playing with my brother. They wrestled with him around the house. They'd be down on the floor. Just depend on what I happened to walk in on. Sometimes they'd be playing video games with him. Sometimes they'd be crawling all over top of him and * * * wrestling with him. I mean, seemed pretty normal." When asked how Gary disciplined the boys, John stated, "we have what we call the look in our family. My dad gave it to us. We gave it to our kids. I have never, never, seen my brother spank his kids. I have seen him give the look and the look usually suffices."
 {¶ 96} John, however, did admit that Gary "could've provided a healthier household for the kids." According to John, Gary "could've went out and made himself more job-worthy. Thought that he could've given the kids a better station in life."
 {¶ 97} John testified that he deeded the house to Gary in April of 2002, but that Gary did not *Page 21 
immediately move in, because the house was "pretty much in disarray" after John and Gary's twin brothers moved out. John stated that Gary and the boys lived in the house for about a year before Kim moved in with them. John described Kim as "a calming influence on that atmosphere," and he said the house was well kept while she lived there.
 {¶ 98} John stated that Gary smoked marijuana. John was aware that the water and electricity were turned off at the residence. John and Gary spoke about giving the boys to Theresa on a temporary basis; "my brother was due to get some money from the federal government. They had done something three or four years earlier and they owed him some back pay. With that he was going to be able to pay his DP L up-to-date, get everything turned back on. And I thought from that point, with our help and our influences, that he would be able to make do."
 {¶ 99} According to John, Gary had been "inundated. * * * his girlfriend, the live-in, she left with three kids all under the age of five years old. * * * with a single guy with no education, no job, I mean, it was a rough spot that he was put in and he did the best he could for three or four years until it overwhelmed him. And even with our help and Theresa's help he still fell through." John testified that the boys are "good kids."
 {¶ 100} When asked about his visits to Gary's home, John testified, "Sometimes I'd show up on a Saturday morning, sometimes I'd show up on a Wednesday night at eight o'clock. I didn't want it to be a prepared thing where he was ready for me to come in and had things cleaned up for his bigger brother." John stated he wanted an "overview" of the "house as it was."
 • {¶ 101} Gary Ryan Blackburn ("Ryan") testified that he is Gary's other son. Ryan testified that he visited Gary and the boys often and would show up unannounced. He stated that the *Page 22 
boys loved their father, and that he did not observe anything within the home that caused him concern. Ryan stated, after Kim (Ryan's mother) moved out of the house the conditions in the home "weren't the best. * * * my father was in and out of jobs but one thing there was always food, there was always water, there was always electricity. * * * it wasn't the cleanest; it wasn't the model dad; it wasn't by no means, but it was definitely reasonable." On further questioning, Ryan admitted that he was aware that Gary lost electricity, water and that Gary was running out of food. Ryan stated that he himself brought food to the boys. Ryan stated that he knew Theresa, and that she treats the boys well. Ryan also stated that the boys are good boys.
 • {¶ 102} Brian Amore also testified on Gary's behalf. Brian and Gary have been friends for 20 years, and during the time period between 2002 and 2005, Brian testified that he visited Gary two or three times a week, dropping in unannounced. He observed Gary "and the kids * * * playing or whatever, watching TV, kids playing with the other kids. I mean, nothing out of the ordinary." Brian never observed any injuries to the kids. He was aware that Gary's water and electricity had been turned off for nonpayment. When asked about the condition of Gary's house, Brian described it as "a little on the decline" and needing "remodeling." Brian stated that he had observed Gary smoke marijuana. Brian testified that the children were good boys.
 • {¶ 103} Kimberly Blackburn, the wife of Gary's brother John, also testified. According to Kimberly, the boys were fond of Gary, and she never observed any injuries. Kimberly did have concerns about the household, however, when the utilities were turned off. She believed Theresa, whom she has never met, "was like to have someone temporarily take the kids for you until *Page 23 
you could get things back in order." Kimberly was aware Gary smoked marijuana but was not concerned about his drug use.
 • {¶ 104} Finally, Gary testified. He stated that he was arrested August 23, 2005, released, and then arrested again August 21, 2007. When he was released in 2005, he testified that Theresa instituted a formal custody action against him, getting full custody in 2006.
 {¶ 105} Gary testified that M.M. was at his home every weekend the last four months that Gary was in the house. Gary testified that M.M. played with Gary's boys, but "about the last two months he was showing * * * signs of a behavioral problem." Gary "wasn't really sure what was linked to that but it was overcoming my kids, as well." Gary stated he observed M.M. "humping" one of the twins and told M.M. not to do so.
 {¶ 106} When asked if he ever changed M.M.'s diapers, Gary replied, M.M. "was supposedly to wear the training diapers for night and in the daytime he would wear underwear. But sometimes [M.M.] had accidents in his underwear and the underwear would get lost in the house with the kids being there and stuff * * * ." Gary stated that he had no way to wash anything in the house because there was no water. He was asked, "So, if you had, or if anyone had, towels to wipe up blood, you wouldn't put them in the washer, you'd just put them in the corner until they accumulated," and Gary responded, "I mean, what else am I going to do with them, you know?" Gary stated that M.M.'s behavior declined the last two times he stayed for the weekend.
 {¶ 107} Gary testified that Theresa and her sister came by "whenever they wanted to. I never controlled when they came by." Gary denied all of the boys' allegations, stating that he had never been sexual with or physically abusive to them. Gary admitted to smoking marijuana but *Page 24 
denied asking the boys to do so. Gary stated that the twins wet the bed repeatedly, but that J.F. did not. Gary denied that the boys had nightmares routinely.
 {¶ 108} Gary stated he agreed to give Theresa full custody, because "my attorney at the time told me that there was going to be charges pending and I didn't want these kids uplifted out of Theresa [M.'s] home and put in somebody else's foster care. I had that right. But I never exercised that right. And since they were related, I thought it would be best if them kids stayed in her care." Gary stated that he had supervised visitation with the boys for ten months at Children Services; when Children's Services required him to pay for visitation privileges at Erma's House, Gary stopped seeing the boys because he did not have any money. Gary stated, while the boys were with him, they were good boys, and they never had any problems.
ANALYSIS
 {¶ 109} Gary argues that this matter "rests exclusively on which witness is believed," and that the evidence against him is not credible. According to Gary, "[a]ssumptions, inferences, beliefs, and credibility opinions without more in corroboration are insufficient to reach that level of proof beyond reasonable doubt."
 {¶ 110} While the children's testimony regarding repeated anal and oral rape over such a lengthy period of time is uncorroborated by physical evidence, Brenda Miceli, Pam Bailiey, and Lori Vavul-Roediger provided plausible explanations for this lack of evidence. It is important to note that neither Brenda, Pam nor Lori rendered opinions as to whether or not the boys had been abused, and they did not state an opinion as to Gary's guilt or innocence. The jury was certainly free to believe the children and disbelieve Gary.
 {¶ 111} Brenda Miceli, an expert in clinical psychology with specialized knowledge in *Page 25 
the area of sexual abuse, testified regarding common characteristics of children who have been sexually abused. Brenda described the difficulty children aged three to six have putting specific events and their frequency into a time frame, such that if abuse is occurring routinely, children have difficulty recalling the sequence and specifics of each incident and the time period within which it occurred. The jury could have reasonably found the boys' testimony that they were abused credible, despite their inability to describe each specific incident or the frequency of incidents within a time line, given their age.
 {¶ 112} As to the children's failure to timely disclose the abuse to Theresa or their other aunt, Brenda testified regarding "general patterns that we often see particularly in the area of disclosure, where many kids don't disclose initially * * * ." According to Brenda, the average length of time between abuse and disclosure is three years, due perhaps to the child's fear of getting into trouble, or fear that their abuser, whom they may still love, will get into trouble. The jury could have reasonably concluded that the boys did not immediately disclose the abuse because they were afraid of Gary, and not because the abuse did not occur. That the children were more willing to discuss what happened to them with Theresa and the authorities after they had been at Theresa's home for some time is consistent with Brenda's testimony that as abused children feel more secure over time, they become more willing to disclose information regarding the abuse. While Gary argues that the children may have been "coached" in their stories, the jury could have reasonably believed that the boys told the truth as Z.F. indicated they were instructed to do by Theresa. Finally, the witnesses on both sides described the boys as "good boys," and there was no suggestion that any of the boys were prone to fabricating stories.
 {¶ 113} Pam Bailey testified regarding the children's various diagnoses of PTSD, *Page 26 
DDNOS, bedwetting, nightmares and anxiety, and she described three different groups of behavioral difficulties, noting that these behaviors are not necessarily indicative of sexual abuse. Pam testified that J.F. and B.F. also exhibited sexually reactive behaviors, which she testified can be consistent with abuse. If the jury believed the boys had been raped by their father, the jury could have reasonably inferred that the behaviors the boys exhibited were corroborative of their allegations of abuse.
 {¶ 114} Regarding the boys' testimony that Gary knocked them unconscious after each episode of abuse, which may initially seem incredible, Brenda explained to the jury that children, feeling helpless in such a situation, and also perhaps guilty for not having done something to stop the abuse, embellish the violence inflicted upon them. In other words, in the child's mind, if the abuser is violent and aggressive, it cannot be the child's fault that he was not able to stop the abuse. On cross-examination, Z.F. testified that after being raped, he was knocked to the ground, and that he was afraid to open his eyes and get up. Similarly, B.F. testified that Gary knocked him to the ground, and B.F. stated he stayed there and went to sleep because he was afraid to get up. The jury could have reasonably concluded that the boys were knocked to the floor, and embellished the story of being knocked unconscious, because they felt helpless and guilty, consistent with Brenda's testimony. Additionally, the testimony that such young children were forced to use marijuana may have affected their function or awareness.
 {¶ 115} Gary further argues that the lack of physical evidence of abuse belies the boys' credibility. However, as the State asserts, the boys' physical examinations occurred weeks after the alleged sexual assaults. Lori Vavul-Roediger testified that a normal anal exam does not "rule out the possibility of sexual abuse or penetration with regard to pre-adolescent boys." She also testified that *Page 27 
in the process of an anal exam, the exam is external, and the internal rectal canal area is not observed. Lori described the elastic and distensible nature of the anal structure, and she testified that anal injuries heal quickly and often with complete resolution such that they are no longer visible. Lori has clinical experience observing significant anal lacerations that are undetectable five days later on a follow-up exam. Finally, Lori testified that children frequently abused often voluntarily dilate their sphincters to tolerate the penetration less painfully and avoid injury. The jury could have reasonably concluded that the lack of trauma revealed at the boy's exams, four weeks after Gary abused them, indicates that boys' injuries had healed.
 {¶ 116} Additionally, if believed, Shelley's testimony regarding M.M.'s hysterical refusal to get out of the car at Gary's house, coupled with her description of his missing underwear and painful bathing experience, lends credibility to the testimony of the brothers regarding the abuse occurring at Gary's house.
 {¶ 117} Regarding the defense evidence of repeated unannounced family and friends dropping by at all hours who would have likely witnessed any at least some of the abuse, we note that Bradley admitted that he only visited Gary and the boys three times after his mother, Kim, moved out of the house. Further, the jury may have doubted Ryan's credibility after he testified on direct that at Gary's house, "one thing, there was always food, there was always water, there was always electricity," but then on cross-examination admitted to being aware that Gary was without electricity and water, and was running out of food.
 {¶ 118} Gary also argues that Theresa had a financial motive to pursue custody of the boys. The jury could have reasonably rejected this testimony and concluded Theresa's interest was solely the well-being of the children. The testimony established Theresa made sacrifices for the boys *Page 28 
and did not receive a financial windfall.
 {¶ 119} Finally, we note, Gary was asked if he had bloody towels, would he put them in the corner until they accumulated, and the jury could have concluded that his response, "what else am I going to do with them, you know," is indicative of guilt. Gary did not deny the presence of bloody towels in his home.
 {¶ 120} Having reviewed the entire record, weighed all of the evidence and the reasonable inferences, and considered the credibility of the witnesses, we cannot determine that the jury clearly lost its way and created a manifest miscarriage of justice such that a new trial is warranted. In other words, the evidence herein does not weigh heavily against conviction. Given the jury's ability to see and hear the witnesses, we extend substantial deference to the jury's determinations of credibility, and we will not substitute our judgment for that of the jury because it is not patently apparent that the jury lost its way in arriving at its verdict.
 {¶ 121} Further, having reviewed the evidence in a light most favorable to the State, we conclude that any rational juror could have found the essential elements of rape of a child less than ten, in violation of R.C. 2907.02(A)(1)(b), in counts one through six of the Complaint, proven beyond a reasonable doubt.
 {¶ 122} Gary's assignment of error is overruled, and the judgment of the trial court is affirmed.
BROGAN, J. and GRADY, J., concur.
Copies mailed to:
Johnna M. Shia
 Richard A. Nystrom *Page 29 
 Hon. A. J. Wagner *Page 1