[Cite as *State v. Jackson*, 2015-Ohio-5096.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27479 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOSHUA JACKSON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2012 09 2548 |

DECISION AND JOURNAL ENTRY

Dated: December 9, 2015

MOORE, Judge.

{¶1} Defendant-Appellant Joshua Jackson appeals from his convictions in the Summit Count Court of Common Pleas. We affirm.

I.

{¶2} In September 2012, Mr. Jackson was indicted on four counts of sexual battery. It was alleged that Mr. Jackson engaged in sexual conduct with his eldest daughter, C.J., and that the conduct occurred on four separate occasions, beginning in 2006 and ending on June 10, 2011.

{¶3} The matter proceeded to a jury trial. The jury found him guilty on counts two and four, not guilty on count three, and was unable to reach a verdict on the remaining count. The State dismissed the latter charge. The trial court sentenced Mr. Jackson to an aggregate term of ten years in prison.

{¶4} Mr. Jackson has appealed, raising five assignments of error, which will be addressed out of sequence to facilitate our analysis.

2

II.

## ASSIGNMENT OF ERROR V

[MR. JACKSON'S] CONVICTION IN THIS CASE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IN VIOLATION OF [MR. JACKSON'S] RIGHTS AS GUARANTEED TO HIM BY THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND OHIO CONSTITUTION.

{¶5}    Mr. Jackson asserts in his fifth assignment of error that his convictions are against the manifest weight of the evidence. Specifically, Mr. Jackson points out that there was no DNA evidence linking him to the crimes, there were no other eyewitnesses to the crimes, he did not confess to the crimes, and in fact denied doing so. Additionally, Mr. Jackson argues that C.J. was not a credible witness.

{¶6}    When a defendant asserts that his conviction is against the manifest weight of the evidence:

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶7}    Mr. Jackson was found guilty of two counts of sexual battery, in violation of R.C. 2907.03(A)(5). R.C. 2907.03(A)(5) states that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person."

> "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of

3

another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶8} C.J. was born in October 1991. Her parents, Mr. Jackson and Hope Brown, married in 1993, and had two additional children, S.J., C.J.'s younger sister, and N.J., C.J.'s younger brother. About the time C.J. entered eighth grade, due to shared interests in movies, video games and music, C.J. became closer to Mr. Jackson than Ms. Brown. C.J. considered Mr. Jackson to be like a best friend. Around the age of 14, Mr. Jackson began to make sexual remarks to her and also began supplying her with alcohol; C.J. testified that they would drink together, sometimes to the point of intoxication. Mr. Jackson also began to touch C.J. Initially, he would only touch or rub her back and leg; however, the touching gradually progressed to Mr. Jackson touching her genital area over clothing. At some point during her teenage years, Mr. Jackson began questioning C.J. about her interest in pornography. He provided her with a couple of pornographic DVDs to watch and also showed her a video of himself and Ms. Brown having sex. Ms. Brown verified that such a video existed.

{¶9} During C.J.'s teenage years, the family moved around fairly frequently. In 2005 through 2006, when C.J. was in the eighth grade, the family was living in Cuyahoga Falls on Keenan Avenue. At the time, Mr. Jackson and Ms. Brown were having difficulties with C.J., who was acting out, sneaking out of the house, and lying. During a heated argument with Ms. Brown, C.J. blurted out allegations that Mr. Jackson had engaged in inappropriate sexual conduct with her. C.J. also reported those allegations to a middle school counselor or teacher, who reported them to the Children's Services Board ("CSB").

{¶10} Ms. Brown confronted Mr. Jackson about the allegations and Mr. Jackson adamantly denied them. Thereafter, Mr. Jackson moved out of the home into a hotel, and

4

eventually into an apartment. Because of C.J.'s recent history of lying, Ms. Brown did not believe C.J. When Ms. Brown heard that CSB was coming to the house, she became distraught. She was afraid that she would not be able to make it without her husband and his income, since she did not work much.

{¶11} She told C.J. that if she told CSB the same thing she told Ms. Brown, that CSB would put her and her brother and sister in foster care. Ms. Brown told C.J. that she needed to tell the truth, but she did so in a way that could have been perceived as, "this is your fault and you need to make it right." Thus, while Ms. Brown denied that she told C.J. to recant, she did believe that C.J. could have perceived Ms. Brown's behavior as instructing her to recant. C.J. testified that Ms. Brown told her she needed to recant and that she would buy C.J. something if she did. Ms. Brown denied promising to buy her anything. Ultimately, when C.J. did go and talk to CSB, she recanted the allegations and the case was closed. Because C.J. recanted, Ms. Brown continued to believe that C.J. was lying when she originally accused Mr. Jackson of sexually inappropriate behavior.

{¶12} Shortly thereafter, Ms. Brown began to have a difficult time controlling C.J.'s behavior; C.J. became very verbally and physically aggressive. Thus, Ms. Brown sent C.J. to stay with Mr. Jackson in his apartment located in the Bridgewater complex in Stow. During the summer of 2006, C.J. alleged that after C.J. and Mr. Jackson had been drinking, Mr. Jackson began to ask her if he could perform oral sex on her. C.J. said no. C.J. became intoxicated and the two ended up in her bedroom. C.J. alleged that she remembered Mr. Jackson performing cunnilingus on her. These allegations formed the basis of count one; the State dismissed this count following trial after the jury could not reach a verdict.

{¶13}   C.J. spent the 2006 to 2007 school year, her freshman year, studying online.  Mr. Jackson and C.J. moved back to the house on Keenan Avenue in Cuyahoga Falls, and C.J. had a bedroom in the basement, where Mr. Jackson's office also was located.  One morning, C.J. noticed a red light coming from the back right corner of her closet in her bedroom.  When she looked closer, she discovered it was a camera.  C.J. told Ms. Brown about the camera.  Ms. Brown discovered that the camera wires led from C.J.'s room into Mr. Jackson's office.  Ms. Brown confronted Mr. Jackson about it; he maintained that he put the camera there to keep track of C.J. because she was prone to sneaking out.  Ms. Brown testified that Mr. Jackson never discussed with her putting a camera in prior to doing so, and she did not know anything about it until C.J. brought it to her attention.

{¶14}   C.J. spent her sophomore year, from 2007 through 2008, living with her maternal grandparents in Minerva, Ohio.  About half-way through the school year, her parents moved to Clinton, Ohio and she would go there and visit them on the weekends.  During one of those weekends over spring or early summer of 2008, she was at her parents' house in Clinton and was drinking Irish Car Bombs with Mr. Jackson in his office.  C.J. testified that Mr. Jackson then proceeded to have vaginal intercourse with her.  These allegations form the basis for count two, of which the jury found Mr. Jackson guilty.

{¶15}   From 2008 until 2009, C.J. attended Green High School and lived with her parents in Clinton.  Sometime during her sophomore or junior year, C.J. told her sister, S.J., about what Mr. Jackson had been doing to her.  S.J. did not initially believe the allegations.  C.J. also testified that she told her mom a couple of times about Mr. Jackson's inappropriate behavior and also her grandmother; however, she asked them not to say anything.  Ms. Brown testified that after the CSB investigation, C.J. did not report any other allegations until 2011.

**{¶16}** In 2009, C.J.'s parents separated. The children lived with Ms. Brown at the house on Keenan Avenue in Cuyahoga Falls and Mr. Jackson moved to Stow. C.J. graduated high school in 2010, but continued to live with Ms. Brown.

**{¶17}** Late in the evening on June 9, 2011,[1] C.J. contacted Mr. Jackson and asked him to pick her up. They went to Mr. Jackson's Stow apartment and began drinking. Mr. Jackson began telling C.J. that they had had sexual intercourse on St. Patrick's Day 2011, which would have been the last time C.J. remembered visiting her father. C.J. testified that she did not remember that happening, but they had been drinking.[2] Mr. Jackson also began asking C.J. to have sexual intercourse with him and began touching her inappropriately. Ultimately, the two went into Mr. Jackson's bedroom to watch a movie. C.J. fell asleep and when she awoke, she was on her stomach and Mr. Jackson's finger was in her vagina and he was rubbing her clitoris. C.J. began crying. She jumped up and attempted to run to the bathroom. Mr. Jackson tried to hold her back but she was able to get away. She then noticed her bra was unclasped. Mr. Jackson followed her into the bathroom and told her not to cry. C.J. testified that she grabbed her cigarettes and went out on the deck to smoke. Mr. Jackson told her that they should go back to bed and they could talk about it when they woke up. After Mr. Jackson went to bed, C.J. called her sister, S.J., and told her to come pick her up. The June 10, 2011 assault formed the basis for count four; the jury found Mr. Jackson guilty of this charge.

**{¶18}** S.J. testified that when C.J. called her to have S.J. come pick her up from Mr. Jackson's, C.J. sounded frightened and distressed, like she was about to cry. S.J. testified that she knew why C.J. was calling; a few weeks prior, in April 2011, S.J. had confronted Mr.

---

[1] Mr. Jackson picked C.J. up on June 9; however, the assault occurred on June 10, 2011.
[2] The St. Patrick's Day incident formed the basis for count three, for which Mr. Jackson was found not guilty.

Jackson about C.J.'s prior allegations against him. The two had been drinking and S.J. asked Mr. Jackson if he ever had sex with C.J. According to S.J., Mr. Jackson told S.J. that, while they were living in Clinton, after he and C.J. had been drinking Irish Car Bombs in his basement office, C.J. asked Mr. Jackson to have sex with her and he complied with her request.

{¶19} When S.J. picked up C.J., she was "very visibly upset." She was shaking and her voice was trembling. S.J. told C.J. that "this ha[d] gone on long enough[,]" and encouraged her to report what happened to the police. C.J. initially called the Cuyahoga Falls Police Department; however, they told her that she needed to go to the Stow Police Department because the assault happened in Stow. After a couple of days, C.J. went to the Stow Police Department with Ms. Brown to report what happened.

{¶20} Detective Jeffrey Swanson from the Stow Police Department investigated C.J.'s allegations against Mr. Jackson. Detective Swanson agreed that neither the Cuyahoga Falls nor the Stow Police Department reports reflected that C.J. had previously recanted allegations concerning Mr. Jackson or that anyone offered to buy her anything if she recanted. He acknowledged that it would have been helpful to know that type of information. Additionally, despite C.J.'s testimony at trial indicating that Mr. Jackson performed oral sex on her at the Bridgewater apartment, in the police report C.J. maintained that he did not touch her during that time frame; however according to the report, he did ask to perform oral sex on her.

{¶21} On June 15, 2011, at the behest of the police, C.J. placed a controlled phone call to Mr. Jackson in an attempt to get him to admit to some of the allegations. Detective Swanson and Ms. Brown were present for the phone call. The phone call was recorded and played for the jury and a transcript of the phone call was also admitted into evidence. During the call, C.J. informed Mr. Jackson that he told her that they had sex on St. Patrick's Day 2011. Mr. Jackson

indicated that he did not remember saying that and that if she wanted to talk about those types of things they should have the conversation in person. Mr. Jackson noted that after C.J. was at Mr. Jackson's place "the other day" and "got pretty upset and left[,]" Mr. Jackson decided that he needed to stop drinking. Mr. Jackson stated that "any stupid bull sh** that's gone on has always been, it, it's always been tied to one or both of us being completely hammered out of our gourd and it just, it's, yeah, like I said, in order for us to move on to any sort of normal, normal relationship and get along with each other in the future, we, we just need to not put ourselves in situations where one or the other of us is gonna do something that we're going to regret." Later in the call, Mr. Jackson apologized for prior unspecified behavior saying, "the only thing I can really offer at this point is just simply * * * an apology for * * * anything that I said or did that you know really upset you over the last however many years * * *." He reiterated that they needed to refrain from drinking to the point of intoxication around each other. When C.J. pointed out that inappropriate things tended to happen when they drink, Mr. Jackson replied that, "there's a simple solution to that. I mean, there, there's no reason that if we're hanging out together that we have to sit around and do shots." He then states that "quite honestly I wouldn't consider doing anything like that unless I was crocked out of my gourd in the first place, so * * * it's got an easy solution." Mr. Jackson then denied having sex with C.J. on St. Patrick's Day. He stated that, "I'm sure I would have remembered something like that so, I, I don't know why I said that."

{¶22} At the request of the Stow Police Department, C.J. also went to the hospital to have a sexual assault examination on June 12, 2011. At this point in time, C.J. had showered, changed clothes, and gone to the bathroom. A sexual assault nurse examiner, Lily Holderbaum, examined C.J. and collected samples based on the history she provided. C.J.'s underwear was

also collected. C.J. indicated that there had been digital penetration of her vagina by Mr. Jackson. C.J. also reported that she was assaulted by Mr. Jackson in the eighth grade and that he told her that they had sex on St. Patrick's Day but she did not remember it; C.J. thought he may have given her a sleeping pill. Ms. Holderbaum documented some redness and an abrasion at the top of C.J.'s labia minora, some skin separation and some redness. Ms. Holderbaum indicated that the injuries were consistent with digital penetration of the vagina. C.J. informed Ms. Holderbaum that she last had consensual sex on June 9, 2011, with Steven B.

{¶23} DNA testing of the evidence collected revealed profiles consistent with C.J., Steven B., and another male. Mr. Jackson was excluded as a possible contributor of the samples collected. C.J. later disclosed that she had also had consensual sex with Corey D.; she failed to initially disclose him as a contributor of DNA because she asserted that she had not had sexual intercourse with him in several weeks prior to June 10, 2011. When the results were compared with Corey D.'s profile, some of the DNA recovered was consistent with Corey D.'s DNA profile. During the investigation, C.J. disclosed that she was pregnant with Corey D.'s child; C.J.'s daughter was born in February 2012.

{¶24} Lynda Eveleth, a forensic scientist with the Ohio Bureau of Criminal Identification ("BCI") whose duties included comparing DNA profiles from evidence samples to DNA profiles from known standards, testified that it was not surprising that Mr. Jackson was excluded as a contributor given C.J.'s allegations that he penetrated her vagina with his finger. Ms. Eveleth explained that "[i]f there is digital penetration of [the] vaginal area, * * * we may not be able to detect the individual who is digitally penetrating because there's a lesser amount of DNA that's from that area compared to the vaginal area. We would expect to have more DNA from the vaginal cells than from the digital penetration."

**{¶25}** Mr. Jackson testified in his own defense denying all of C.J.'s allegations concerning the sexual assaults. With respect to the June 10, 2011 assault, Mr. Jackson denied that anything inappropriate happened. He said the only unusual thing that happened was that, when he woke up, C.J. was sitting on his bed. They went outside and had a cigarette and he told her to go back to sleep. When he woke up again, she was gone. He also denied telling S.J. that he had sex with C.J. However, he acknowledged that he had a conversation with S.J. about the allegations. Mr. Jackson hoped that S.J. just misinterpreted the conversation, as her testimony that he had admitted to having sex with C.J. was false. Mr. Jackson further denied sharing any pornography with C.J. He testified that it was a mistake to allow C.J. and S.J. to consume alcohol. However, he denied specifically providing them with alcohol; instead, he maintained that the alcohol was there and he did not stop them from having it. Mr. Jackson admitted to putting a camera in the basement of the house, but denied that he put it in C.J.'s bedroom. He stated that, at the time the camera was installed, the whole basement was an office and he installed it in that area, an area that later became C.J.'s bedroom.

**{¶26}** After a thorough and independent review of the record we cannot say that the jury committed a manifest miscarriage of justice in finding Mr. Jackson guilty of the two counts of sexual battery. Specifically, the jury found Mr. Jackson guilty of counts two and four. Those counts related to the allegations that Mr. Jackson had sexual intercourse with C.J. at the house in Clinton in 2008 and that Mr. Jackson digitally penetrated C.J.'s vagina on June 10, 2011. We cannot say that the jury lost its way in finding Mr. Jackson guilty.

**{¶27}** C.J. testified that Mr. Jackson had vaginal intercourse with her in 2008 at the house in Clinton. She indicated that, prior to doing so, they had been drinking Irish Car Bombs. S.J.'s testimony partially corroborated C.J.'s testimony. S.J. testified that Mr. Jackson told her

that he and C.J. had sex in the basement office of the house in Clinton after drinking Irish Car Bombs. While S.J. testified that Mr. Jackson claimed that C.J. asked him to have sex with her, such is immaterial to the charge at issue. *See* R.C. 2907.03(A)(5) (prohibiting the victim's natural parent from engaging in sexual conduct with the victim); *see also State v. Lowe,* 112 Ohio St.3d 507, 2007-Ohio-606, ¶ 14 ("Courts examining R.C. 2907.03(A)(5) have found the statute clear and unambiguous in its criminalization of all sexual conduct falling within its purview, regardless of a victim's age or consent."). Moreover, the jury could have disbelieved that C.J. made the request. Based upon the record before us, the jury's conclusion that Mr. Jackson engaged in sexual conduct with C.J. during this time frame is not against the manifest weight of the evidence.

{¶28} With respect to count four, C.J. testified that on June 10, 2011, she stayed at her father's place and that the two had been drinking. She awoke to find Mr. Jackson's finger inside her vagina and her bra unclasped. She testified that she started crying and ultimately called S.J. to come pick her up. S.J.'s testimony confirmed C.J.'s emotional state. She testified that C.J. sounded frightened and was on the verge of crying. When S.J. picked C.J. up, C.J. was shaking and her voice was trembling. Additionally, there was testimony that C.J.'s vaginal injuries were consistent with digital penetration and that it was not surprising that DNA consistent with Mr. Jackson's DNA was not found under the circumstances. Thus, we cannot say that the jury's finding that Mr. Jackson engaged in sexual conduct with C.J. on June 10, 2011, was against the manifest weight of the evidence.

{¶29} While it is true that Mr. Jackson denied both sets of allegations, the jury could have reasonably disbelieved his testimony. The jury was able to hear and observe Mr. Jackson's testimony and also heard Mr. Jackson's controlled phone call. While Mr. Jackson did not admit

to any sexual conduct during the call, in the face of allegations by C.J. of sexual improprieties, he did not clearly deny the allegations. When prompted with C.J.'s questions and statements, Mr. Jackson offered apologies and acknowledged that there were problems in their relationship. Mr. Jackson believed that the solution to the issues C.J. was raising was that the two just should not drink around each other, because he "wouldn't consider doing anything like that unless [he] was crocked out of [his] gourd in the first place * * *." From the totality of the evidence, the jury could have reasonably inferred guilt by the manner in which Mr. Jackson responded to C.J.'s accusations during the phone call. Mr. Jackson did not raise his voice or sound overly shocked or surprised by C.J.'s accusations. Overall, he seemed to maintain a calm tone; something that the jury could have found inconsistent with his trial testimony that he did not engage in sexual conduct with his daughter. *See State v. Blackburn,* 2d Dist. Montgomery No. 22679, 2009-Ohio-889, ¶ 119 ("Finally, we note, [the defendant] was asked if he had bloody towels, would he put them in the corner until they accumulated, and the jury could have concluded that his response, 'what else am I going to do with them, you know,' is indicative of guilt. The defendant did not deny the presence of bloody towels in his home.").

{¶30}     Further, while C.J. did previously make allegations against Mr. Jackson that she shortly thereafter recanted, the jury could have found credible her explanation for why she did so. The jury could have believed that C.J. only recanted because that is what she believed her mother wanted to her do and because she was afraid of ending up in foster care, or the jury could have disbelieved C.J.'s explanation, but nonetheless, believed that C.J. was telling the truth about the 2008 and June 10, 2011 incidents. We remain mindful that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." (Citations omitted.) *State v. Bulls,* 9th Dist. Summit No. 27029, 2015-Ohio-276, ¶ 17. In reviewing the record, we cannot say that the

jury lost its way in resolving conflicts in the evidence or in making credibility determinations. Accordingly, Mr. Jackson's argument is without merit.

**{¶31}** Mr. Jackson's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY DENYING [MR. JACKSON'S] MOTION FOR MISTRIAL WHICH WAS MADE AFTER IMPROPER REMARKS BY THE PROSECUTING ATTORNEY DURING QUESTIONING OF A STATE'S WITNESS, IN VIOLATION OF [MR. JACKSON'S] RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND [OHIO CONSTITUTION, ARTICLE I, SECTION 16].

**{¶32}** Mr. Jackson asserts in his first assignment of error that the trial court erred in denying his motion for a mistrial. We do not agree.

**{¶33}** "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Witcher,* 9th Dist. Summit No. 26111, 2012-Ohio-4141, ¶ 32, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for a mistrial is whether the substantial rights of the accused are adversely affected." *Witcher* at ¶ 32, quoting *State v. Wooden*, 9th Dist. Summit No. 21138, 2003-Ohio-1917, ¶ 33, quoting *Wadsworth v. Damberger*, 9th Dist. Medina No. 3024-M, 2000 WL 1226620, *2 (Aug. 30, 2000). "Due to the variety of circumstances in which mistrial may emerge, great deference must be given by a reviewing court to the trial court's discretion as the trial court judge is in the best position to assess the situation and determine whether a mistrial is appropriate." *Witcher* at ¶ 32, quoting *Wooden* at ¶ 33, citing *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Thus, "[a] trial court's ruling on a motion for mistrial will be reversed only for an abuse of discretion." *Witcher* at ¶ 32, quoting *Wooden* at ¶ 33. "The term 'abuse of discretion' connotes * * * that the court's

attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶34}** Here, during the re-cross-examination of Detective Swanson, defense counsel asked questions about C.J.'s initial failure to disclose her involvement with Corey D. and how that affected the investigation. During redirect, the following exchange took place:

> [Prosecutor:] Is it relevant to [Mr. Jackson's] innocence or whether or not he's guilty who a 19-year-old woman[, C.J.,] had voluntarily engaged in sexual intercourse with?
>
> [Detective Swanson:] It is not.
>
> [Prosecutor:] Is it an attempt to smear her, smear her character, bring –
>
> [Defense counsel:] Objection.
>
> [The trial court:] Overruled.
>
> [Defense Counsel:] Judge, permission to approach?

Following a sidebar conference, the trial court instructed the jury "to disregard the last question[]" and ordered it "stricken form the transcript."

**{¶35}** After Detective Swanson finished testifying and the State moved for admission of its exhibits, Mr. Jackson's counsel moved for a mistrial. Defense counsel stated:

> The jurors have now heard from the prosecutor that questions were being asked merely to, quote, smear the victim's character.
>
> I believe that that puts counsel in a situation where I cannot expect the jury, having that been stated by the prosecutor and heard by the jury, to give any credibility to me or anything I say or do; and therefore, prejudices my client. And I do not believe that having heard it, the Court telling him to withdraw the question or the Court * * * later giving a curative instruction would cure that. * * *

**{¶36}** The trial court denied the motion stating, "it's my understanding that [a mistrial] is only necessary when a fair trial is no longer possible. And I think the fact that that was stricken and I advised the jury to ignore it and I can give a further curative instruction, I don't

think the Prosecutor's statement that this was an attempt to smear the victim is enough to affect the substantial rights of [Mr. Jackson.]"

{¶37} During the jury instructions, the trial court informed the jury that,

[s]tatements or answers that the Court struck or instructed you to disregard are not evidence and must be treated as though you have not heard them. Objections. You must not speculate as to why the Court sustained an objection to any question or what the answer to the question might have been. You must not draw any inference or speculate on the truth of any suggestion included in a question that was not answered.

{¶38} Clearly, the prosecutor's attempted question was improper. The State does not challenge the trial court's finding on that point on appeal. Instead, the issue is whether that attempted improper question warranted a mistrial.

{¶39} We cannot say that the record discloses that Mr. Jackson's substantial rights were adversely affected the by question in light of the trial court's response. While the trial court initially overruled the objection, following a sidebar, the trial court instructed the jury to disregard the question and ordered it stricken from the record. The trial court issued a similar, although more general, reminder during the jury instructions. "A jury is presumed to follow the trial court's instructions, and Mr. [Jackson] has not pointed to anything in the record that indicates that the jury failed to do so." *State v. Boden,* 9th Dist. Summit No. 26623, 2013-Ohio-4260, ¶ 38; *see also State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 122-131 (concluding a mistrial was not warranted when an isolated, improper question by the prosecutor was cured by a corrective instruction).

{¶40} Given the foregoing, we cannot say that Mr. Jackson has demonstrated that the trial court abused its discretion in denying his motion for a mistrial. Mr. Jackson's first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

[MR. JACKSON] WAS PREJUDICED BY IMPROPER REMARKS BY THE PROSECUTOR BEFORE THE JURY DURING THE TRIAL OF THIS CASE, WHICH REMARKS CAUSED PREJUDICE TO [MR. JACKSON] AND DEPRIVED [MR. JACKSON] OF THE RIGHT TO A FAIR TRIAL, IN VIOLATION OF [MR. JACKSON'S] RIGHT TO DUE PROCESS AS GUARANTEED TO HIM BY THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND [OHIO CONSTITUTION, ARTICLE I, SECTION 16].

{¶41} Mr. Jackson asserts in his third assignment of error that certain remarks by the prosecutor were improper and deprived him of a fair trial. Specifically, Mr. Jackson points to two instances of alleged misconduct on the part of the prosecutor: (1) the improper question directed at Detective Swanson, discussed in the analysis of Mr. Jackson's first assignment of error; and (2) statements by the prosecutor during the rebuttal portion of closing argument in response to incorrect statements of law made by defense counsel during closing argument.

{¶42} "With regard to each allegation of misconduct, we must determine whether the conduct was 'improper, and, if so, whether [it] prejudicially affected substantial rights of the defendant.'" *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 110, quoting *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Pickens,* 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 110, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "A reviewing court 'will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments.'" *State v. Easley,* 9th Dist. Summit No. 27008, 2014-Ohio-575, ¶ 33, quoting *State v. Jackson,* 107 Ohio St.3d 300, 2006-Ohio-1, ¶ 142.

{¶43} With respect to the State's improper question posed to Detective Swanson, we previously concluded that the question was improper. Nonetheless, we also determined that, in

light of the trial court's response, the prosecutor's question did not adversely affect Mr. Jackson's substantial rights. *See Pickens* at ¶ 120.

{¶44} Because it is clear beyond a reasonable doubt that a jury would have convicted Mr. Jackson of the two counts even without the improper question, Mr. Jackson has not established his entitlement to a new trial. *See Easley* at ¶ 33.

{¶45} Mr. Jackson also argues that a portion of the prosecutor's rebuttal during closing argument was improper. We note that Mr. Jackson did not object to the prosecutor's statements and so Mr. Jackson's argument is reviewable only for plain error. *See Pickens* at ¶ 109.

{¶46} "Not every comment by counsel can be a basis for reversal." *State v. Frazier*, 73 Ohio St.3d 323, 341 (1995). "Parties are granted latitude in closing arguments, and the question as to the propriety of these arguments is generally considered one falling within the sound discretion of the trial court." *State v. Bowerman,* 9th Dist. Medina No. 13CA0059-M, 2014-Ohio-4264, ¶ 17, quoting *Frazier* at 341, quoting *State v. Loza*, 71 Ohio St.3d 61, 78 (1994).

{¶47} During Mr. Jackson's counsel's closing argument, his counsel incorrectly stated that, "[c]ircumstantial evidence is not as reliable as direct evidence. Make no mistake about it." The prosecutor objected, and the trial court sustained the objection. The trial court then informed the jury that, defense counsel's comment was "an incorrect statement of the law, so disregard that statement." During rebuttal, the prosecutor stated that, "the Court is going to instruct you during the instruction portion of this trial that direct and circumstantial evidence are of equal value. So what the defense attorney, what he told about the law, is completely incorrect and not accurate and will be inconsistent with the law that [the Court] gives you." While Mr. Jackson's trial counsel did not object to the foregoing statement by the prosecutor, Mr. Jackson asserts on appeal that it was improper.

{¶48} In light of Mr. Jackson's argument, we cannot say the prosecutor's comments were improper; thus, we are unable to conclude that plain error exists. The Supreme Court of Ohio has held that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value[.]" *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. Therefore, defense counsel's statement was incorrect and inaccurate. Moreover, the trial court, during the jury instructions, did tell the jury that, "[d]irect and circumstantial evidence are of equal weight or probative value." Mr. Jackson has not asserted that the prosecutor's statement, or the trial court's instruction, concerning the value of circumstantial and direct evidence was incorrect; instead, he argues that the prosecutor's comment was unnecessary given that the trial court sustained the State's objection about the error in defense counsel's statement. Mr. Jackson has not pointed to any law requiring the prosecutor to limit himself or herself during closing argument to only those statements which the defense believes are necessary. *See* App.R. 16(A)(7). While "[i]t is improper [for the prosecution] to denigrate defense counsel in the jury's presence[,]" we cannot say that the statements made by the State, taken in context, did so on this occasion. *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 304. Instead, the prosecutor provided the jury with a generally correct statement of the law and reminded it that defense counsel's statement was incorrect. We remain mindful that, "[a] prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones." *Frazier,* 73 Ohio St.3d at 341, quoting *Smith,*14 Ohio St.3d at 14.

{¶49} In light of the foregoing, we cannot say that Mr. Jackson has demonstrated the existence of misconduct that prejudiced his substantial rights. Mr. Jackson's third assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY MAKING REMARKS IN FRONT OF THE JURY DURING THE TESTIMONY OF A STATE'S WITNESS, IN VIOLATION OF [MR. JACKSON'S] RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND [OHIO CONSTITUTION, ARTICLE I, SECTION 16]. ALTHOUGH [MR. JACKSON] DID NOT OBJECT TO THESE REMARKS, IT WAS PLAIN ERROR FOR THE COURT TO HAVE MADE THOSE REMARKS IN THE PRESENCE OF THE JURY.

{¶50} Mr. Jackson asserts in his second assignment of error that the trial court committed prejudicial error by making statements in front of the jury that could be perceived as vouching for the witness. While we agree that the trial court's comments were improper, we do not agree that reversible error exists.

{¶51} We note that Mr. Jackson's trial counsel did not object to the trial court's comments, and thus this issue is only reviewable for plain error. *See* Crim.R. 52(B); *State v. Brown,* 9th Dist. Wayne No. 11CA0054, 2013-Ohio-2945, ¶ 49. "[T]he accused bears the burden of proof to demonstrate plain error on the record * * * and must show an error, i.e., a deviation from a legal rule that constitutes an obvious defect in the trial proceedings[.]" (Internal quotations and citations omitted.) *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22. "However, even if the error is obvious, it must have affected substantial rights, and [w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." (Internal quotations and citations omitted.) *Id.* "The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice * * *." (Emphasis omitted.) *Id.*

{¶52} "In exercising his [or her] duty to control a criminal trial pursuant to R.C. 2945.03, the trial judge is to remain impartial and refrain from making comments which may influence a jury." *State v. McCarley,* 9th Dist. Summit No. 22562, 2006-Ohio-1176, ¶ 9. "[T]he

judge must be cognizant of the effect of his [or her] comments upon the jury[.]"  *Id.,* quoting

*State v. Wade*, 53 Ohio St.2d 182, 187 (1978), *vacated and remanded on other grounds*, 438 U.S.

911 (1978).  A judge's "participation by * * * comment must be scrupulously limited, lest the

court, consciously or unconsciously, indicate to the jury its opinion on * * * the credibility of a

witness."  *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113 (1970), paragraph three of the syllabus.

"Furthermore, 'juries are highly sensitive to every utterance by the trial judge' and any

comments by the trial judge must be appropriate under the circumstances."  *McCarley* at ¶ 9,

quoting *Wade* at 188.

> Generally, in determining whether a trial judge's remarks were prejudicial, the courts will adhere to the following rules:  (1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.

*Wade* at 188; *see also McCarley* at ¶ 9; *Brown*  at ¶ 49.

{¶53}  The comments by the trial court at issue occurred during trial while Ms. Eveleth

was testifying.  During redirect examination, the prosecution elicited testimony from Ms. Eveleth

that she agreed that "the vaginal cells can overwhelm any touch DNA left by fingers[.]"  On re-

cross-examination, the following exchange occurred between Ms. Eveleth, the attorneys, and the

trial court:

> [Defense counsel:]  Ma'am, I assume that overwhelming by the vagina would also come into play on the semen itself, not just touch DNA, correct?
>
> [Ms. Eveleth:]  For semen cases, we're able to separate out sperm cells from the majority of the remaining cells, which allows us to be able to obtain a DNA profile from sperm.
>
> [Defense counsel:]  My question was it can eventually be overwhelmed by the vaginal cells, correct?

21

[Ms. Eveleth:]  If there is enough male sperm cells on rape cases, then we are able to obtain a DNA profile from that sample.

[Defense counsel:]  I'd appreciate it if you would answer my question.  It was, eventually –

[Prosecutor:]  Objection.

[Defense counsel:] – it can be overwhelmed by the vaginal cells?

[The trial court:]  Sustained.  Sustained.

[Defense counsel:]  Ma'am, it's true that eventually the sperm cells can be overwhelmed by the vaginal cells, correct?

[Ms. Eveleth:]  If there isn't enough –

[Defense counsel:]  Judge, I would ask you to instruct – it's a yes or no question.

[Prosecutor:]  Objection.  She's been answering the question, Judge.

[The trial court:]  Hold on.  If you don't know – if you can't say with certainty based on your training and experience, then simply say I don't know.  Or if you can say yes or no, then answer the question that way.  But I understand you're trying to be – present a scientific answer.  I understand that.  But if you could answer yes or no or I'm not sure, as unsatisfying as that might be to you.

[Prosecutor:]  Judge, if I may, I think maybe the form of the question is what is causing – eventually –

[Defense counsel:] Judge, it's the same form that [the prosecutor] used, and answered "correct" five times in a row for him.

[The trial court:] It was a different question.

[Defense counsel:] It's the same form, though.

[The trial court:] It's the same form.  I'm not objecting to your form.

[Defense counsel:] I understand.

[The trial court:] But what I'm saying is I think this witness is trying to answer honestly and completely and she can't give you a yes or no answer.  Is that fair?

[Ms. Eveleth:]  Correct.

{¶54} Following that exchange, defense counsel concluded his re-cross-examination. Mr. Jackson argues on appeal that the trial court's comment that Ms. Eveleth was "trying to answer honestly and completely" constituted vouching. While from the context of the exchange, such was not likely the intent of the trial court, we agree that the trial court's reference to the witness "trying to answer honestly" was improper and could be perceived by the jury as a comment on the court's belief as to the credibility of the witness. Nonetheless, in light of the fact that it is Mr. Jackson's burden to demonstrate not only error, but plain error, we cannot say he has met his burden. Mr. Jackson has failed to adequately detail how, under the circumstances of this case, that the trial court's isolated comment prejudiced him. Even assuming that the remark by the trial court caused the jury to find Ms. Eveleth more credible, Ms. Eveleth's testimony could be viewed as aiding the defense. She did testify that it was not surprising that Mr. Jackson was excluded as a contributor given C.J.'s allegations that he penetrated her vagina with his finger because "[i]f there is digital penetration of [the] vaginal area, * * * we may not be able to detect the individual who is digitally penetrating because there's a lesser amount of DNA that's from that area compared to the vaginal area. We would expect to have more DNA from the vaginal cells than from the digital penetration." However, she also testified that none of the samples contained a DNA profile consistent with Mr. Jackson's DNA profile; testimony that would also potentially benefit Mr. Jackson.

{¶55} As to the potential impact of the trial court's statement on the jury, during the jury instructions, the trial court told the jury that, "[i]f, during the course of the trial, the Court said or did anything that you consider an indication of the Court's view, you are instructed to disregard it." As noted above, "[a] jury is presumed to follow the trial court's instructions, and Mr. [Jackson] has not pointed to anything in the record that indicates that the jury failed to do so."

*Boden,* 2013-Ohio-4260, at ¶ 38; *but see State v. Luciano,* 9th Dist. Lorain No. 09CA009632, 2011-Ohio-2607, ¶ 16-19 (noting that when the judge limited the instruction to views that might be indicated by his facial expressions, the instruction could not cure the problems created by the judge interjecting his conclusions about what could or must be drawn from the evidence).

**{¶56}** Mr. Jackson's second assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

[MR. JACKSON'S] COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL TO [MR. JACKSON] IN THIS CASE BY VARIOUS ERRORS OF COUNSEL MADE DURING THE COURSE OF TRIAL HEREIN, WHICH ERRORS WERE PREJUDICIAL TO [MR. JACKSON] AND VIOLATED [MR. JACKSON'S] RIGHT TO DUE PROCESS AS GUARANTEED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND [OHIO CONSTITUTION, ARTICLE I, SECTION 16].

**{¶57}** Mr. Jackson argues in his fourth assignment of error that his trial counsel was ineffective. Specifically, he asserts that trial counsel (1) failed to object to the prosecutor's allegedly improper remarks about direct and circumstantial evidence; (2) failed to object to the trial court's remarks about Ms. Eveleth's testimony; and (3) made improper statements during closing argument. We do not agree.

**{¶58}** This Court must analyze claims of ineffective assistance of counsel under a standard of objective reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). Under this standard, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" *Strickland* at 687. A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *Id*. at 694; *see*

*also Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, at ¶ 22. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland* at 689. This Court need not address both prongs of *Strickland* where an appellant fails to prove either prong. *See State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10

**{¶59}** With respect to Mr. Jackson's first argument, that trial court counsel was ineffective in failing to object to the prosecutor's comments during closing argument regarding defense counsel's mistake concerning circumstantial and direct evidence, we already noted above that the prosecutor's comments were not improper. Moreover, Mr. Jackson has not pointed this Court to any rule or case law that would suggest that the trial court should have sustained such an objection had it been made. *See* App.R. 16(A)(7). Further, "[t]his Court has consistently held that trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel." *State v. Velez,* 9th Dist. Lorain No. 13CA010518, 2015-Ohio-642, ¶ 20, quoting *State v. Smith,* 9th Dist. Wayne No. 12CA0060, 2013-Ohio-3868, ¶ 24, quoting *State v. Guenther,* 9th Dist. Lorain No. 05CA008663, 2006-Ohio-767, ¶ 74.

**{¶60}** With respect to Mr. Jackson's argument concerning the trial court's comments during Ms. Eveleth's testimony, we concluded above, that, while the trial court's comments were objectionable, under the circumstances, Mr. Jackson failed to demonstrate that the comments prejudiced him. We can conclude no differently here as Mr. Jackson has not further explained how he was prejudiced.

**{¶61}** Finally, Mr. Jackson asserts that trial counsel's misstatements during closing argument prejudiced him. Specifically, Mr. Jackson points to trial counsel's misstatement of the

law concerning direct and circumstantial evidence, and trial counsel's statement that, "[b]efore you convict Mr. Jackson, go back to that room and consider all the evidence and review it. Put yourself or your son or your brother, your best friend, somebody you care about, in this chair." The latter statement was also objected to by the State, and the trial court sustained the objection. Mr. Jackson argues that trial counsel's "serial misstatements of the law to the jury at the tail end of defense counsel's closing argument could not have done anything other than cause the jury to lose confidence in the credibility and reliability of statements made by defense counsel to them, and thereby preclude[d] [Mr. Jackson] from receiving a fair trial."

{¶62} "Counsel for both sides are afforded wide latitude during closing arguments. Debatable trial tactics generally do not constitute a deprivation of effective counsel." (Citations omitted.) *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 192. Mr. Jackson's argument that trial counsel's improper statements during closing argument caused the jury to lose confidence in the credibility and reliability of trial counsel's statements is speculative. *See id.* This is particularly so in light of the fact that the jury acquitted Mr. Jackson of one charge and was unable to reach a verdict on another. Moreover, we remain mindful that, to be successful in his argument, Mr. Jackson must demonstrate, not only that trial counsel was deficient, but also that the deficiency in the performance of counsel was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* at 687. Additionally, Mr. Jackson has not argued that the trial court's instructions on the law were incorrect; thus, any misstatements of the law by trial counsel were later remedied by the trial court's instructions. *See State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 147 ("While counsel's comments during voir dire did incorrectly describe the defendant's burden in the penalty phase, the errors were harmless. The trial court's correct instruction of the law with

regard to the weighing process cured counsel's much earlier misstatements."). Further, in light of the evidence discussed above, Mr. Jackson has not demonstrated on appeal that, absent trial counsel's misstatements, the result of the trial would have been different.

{¶63} Mr. Jackson's fourth assignment of error is overruled.

III.

{¶64} The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
CARLA MOORE
FOR THE COURT

CARR, P. J.
WHITMORE, J.
CONCUR.


APPEARANCES:

PETER T. CAHOON and JOSHUA D. NOLAN, Attorneys at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.